Good morning, honors. My name is Joshua Bardavid. I'm the attorney for Petitioner Workenhe. Ms. Workenhe? Workenhe, yes, your honor. Okay. At least that's how she says it to me. I'm sure I'm still named. Well, that's okay. That's the way it ought to be then. She provided credible testimony before the agency, and the negative credibility determination and the denial based upon an alleged failure to corroborate was not supported by the evidence and not supported by the record. First, the immigration judge denied the claim for an alleged lack of proving that she was, in fact, married to the individual, her husband, because she didn't present a marriage certificate. And the words used by the immigration judge was that she presented no evidence that she, in fact, was married. First, that statement is entirely incorrect. On page 1200 of the record, she provided an affidavit or a statement from the AAPO head indicating that she was, in fact, married to this individual. Well, the government really has kind of said this marriage one isn't one we really ought to go on too much. Hasn't it? I'm sorry, your honor? Hasn't the government kind of conceded this marriage one? It seemed to me the government concedes this finding lacked merit because the BIA expressly determined the credibility finding shouldn't have been based on the failure to submit the corroborating evidence. Yes, your honor. So I guess we've got to move to one of these others because they have to have just one, right? That's correct. So we've got to move to the passport or we've got to move then to the other claim. Well, really, it would then boil down to just the brother claim. The brother's political activity. Right. Yes, your honor. Dealing with the passport, undoubtedly she was very confused as to the date it was issued. And she did at first say that it was issued in January, but then she specifically on page 761, well, I'm not really sure about the date. I just know it was after the third time the police came to my house. Well, there's a couple of inconsistencies with regard to the passport because she testified that it was taken during, if I recall correctly, the initial encounter. And then it came out that, wait a minute, the passport is actually dated in January before she encountered the police for the first time. And then there was a question of a visa stamp that had, and this is the visa from Austria, that had a January 26, 1993 date. What explanation did she provide to explain those inconsistencies? She, with respect to the date as January 2, 1993, the date of issuance, she stated that her aunt, who had political connections, obtained a new passport after her passport was taken by the police. And because her passport that was taken by the police was not yet expired, for whatever reason in the machinations that her aunt was going through in order to get the replacement, it required backdating the passport. And the agency dismisses this as just simply saying that's not plausible. But they don't explain why that's not plausible. And as we detail in our brief, there are lots of instances where government documents are backdated. In this case, given that there's no explanation as to what is implausible about the government being willing to backdate a passport, particularly where the passport was being obtained. I believe she said she paid some money and it was under the table and her aunt was using some political connections. That was a very plausible explanation. And simply saying it's not plausible is insufficient to explain why their agency is not accepting her explanation. With respect to the Austrian passport, she really doesn't know. She doesn't know why there's this stamp there. And she can't be expected to know because she wasn't involved in obtaining this passport. This passport was, again, obtained through underground means, I guess through Iran, in order to avoid putting her in any danger. And she just simply doesn't understand why there would be a passport there. She knows that there were applications made to various countries. You mean the visa? You're referring to the visa? Yes. Yes. So she gave no explanation for that? Yes. She says she doesn't know. And she can't be expected to know because, again, she wasn't involved in obtaining the passport. So for whatever reason, a visa stamp was put into her passport and she doesn't know about it. And other — I'm sorry, Your Honor? I guess the worry that I have is the standard of review that we have to apply, which is substantial evidence. So even based on what you've told me, I'm having a tough time understanding why there isn't substantial evidence to sustain what the government or what the BIA did here. And, again, it's not simply just the BIA's finding, but it's its lack of explanation. There's a requirement that the BIA provides an explanation for their determinations. And simply stating something is not plausible isn't an explanation. Not plausible is basically a hollow word without some sort of way to back it up. And as we detail, they're incredibly plausible, her explanations provided. So, for example, her — You want to move to the brother? You've given me your best idea on the passport. You want to move to the brother problem? Specifically dealing with the — I'm sorry, which problem? Well, isn't that another basis for the credibility determination was the testimony about the brother? Yes, Your Honor. And so what do you want to say about that? She was in no way inconsistent with respect to her brother. She — there was undoubtedly points where she expressed some confusion, and I believe she mixed up points talking about her husband and her brother. But what is clear is that her brother, she stated, was detained. He was released for a week. Well, but you're really not talking about what the I.J. found. The I.J. rejected the testimony about her brother because they found it was — he found that it was implausible that the Ethiopian government would release her brother for a week to finish a thesis. Yes, Your Honor. She was skeptical about the time of his release happened to coincide with when she needed his assistance in getting the visa. Further, the letter in 1997 that referred to the brother's arrest was recent. So the I.J. said, just can't find there. And her explanation for the brother being released for a week, as we detail, there are always furloughs. There — such things do exist. It's not implausible that an individual is released from detention, especially considering that the request for the release came from the head of the university, so he could finish his thesis. Well, what do you do with Jibril, which says that the I.J. can be allowed to exercise common sense in rejecting the petitioner's testimony, even if the I.J. can't specifically point to specific contrary evidence in the record? In that respect, the I.J. would have been required to consider her entire explanation. And most notably absent from the I.J.'s determination in this respect is any discussion whatsoever of her testimony explaining the circumstances of the release, that he wasn't just simply allowed to go out and roam free. He was kept under guard, monitored the entire time, and then required to immediately return to prison. The I.J. gave no discussion whatsoever of that aspect of her explanation. So at the very least, particularly considering that other bases for the immigration judge's determination have been determined flawed, the matter should be remanded for at the very least consideration of her entire explanation rather than parts of her explanation. Let me ask you about the future persecution, well-founded fear of future persecution. Now, my review of the record is a little — I'm finding the procedural posture of this issue a little unclear, but I guess it seemed to me that there was a remand for the I.J. to review country conditions, and the only reason I can see that they would remand for reviewing country conditions was the motion, the 2001 remand motion. Yes, Your Honor. So it seems to me that on the 2001 remand motion, we're really looking at a motion to reopen. That's correct, Your Honor. And so given that we're looking at a motion to reopen, then we're under an abuse of discretion standard, right? Yes, Your Honor. And so if the BIA is then looking at this, tell me why there isn't substantial evidence to sustain the determination that present country conditions do not support the new claim. Two issues. First, Your Honor, with respect to the standard of review, denial is a motion to reopen a review for abuse of discretion. Considering that this was reopened and the agency issued a new decision, it would be substantial evidence standard. And? Secondly, with respect to whether or not substantial evidence supports the determination, again, the board is required and the immigration judge is required to consider the evidence as a whole. So the immigration judge cites the fact that 10 percent of the parliament is made up of members of Ms. Work and A's tribe. And what the immigration judge doesn't consider is the fact that the State Department reports indicate that thousands, thousands of AAPO members, the organization and its successor, have been jailed and remain jailed and have been tortured and have been oppressed. And so simply saying that some members of her tribe are able to go on into politics doesn't account for the specifics of her claim, which is not just fearing harm on account of her tribal membership, but fearing harm on account of being one of the founding members of a banned political organization, thousands of whose members remain in jail and tortured to this day. I see that. Do you agree that the matter of Bourbano in this particular record only applies to this issue? Yes, Your Honor. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Juria Jones, and I represent the Attorney General of the United States. The standard review here is, does the record compel a conclusion contrary to the Board? And in this case, it does not. The Board — the record supports the Board's determination that the Petitioner provided contradictory testimony throughout her testimony, particularly with regard to the passport, which was pointed out by the Board, as well as the date of issuance. And she provided no explanation whatsoever for the Austrian visa that was stamped in the passport. Initially, she made no mention of the passport being stolen. And then at the record on page 760-761, she said it was stolen the last visit. Then she changed her testimony at page 857-60 and said, no, it was the first time that it was visited. So you have within her own testimony a contradiction as to when this passport, which is a significant event that occurred to her. She wasn't detained. She wasn't beaten. The persecution that she's claiming is the taking of her documents. And this is a significant document that was taken from her. And she's providing contradictory testimony, particularly with regard to the date of the issuance. She testified that her grandmother helped her get her passport, and that's at 7-53. Then she testified that her grandma helped her get her passport on January 2, 1993, and that's at 7-55-56. Then when she was confronted that the issuance, that she claimed that the passport was stolen and the date of issuance, then she came up with the explanation that it was backdated. And the board considered this explanation and rejected it, and it provided a sufficient explanation as to why and gave very cogent reasons as to why this explanation was insufficient. In light of the fact that her testimony itself, she initially said, my grandmother got the passport on January 2, 1993. So within her own testimony, she provided the explanation to the board, and then the board's decision, it reasonably noted that. Kennedy. Do you want to respond to the brother argument that counsel made? Well, as this judge, as Your Honor pointed out, the board and the immigration judges like to use their common sense. And the fact of the matter that Petitioner claimed that her brother was being tortured and beaten as a political opponent, and it seems to be implausible and very unlikely that a detainee of this caliber would be able to be let out for a week to complete his medical thesis and then return back to prison. So given her testimony and given, you know, the history of her inconsistencies and her contradictions, the immigration judge and the board were correct in saying this, your explanation about your brother is just impossible. It was just too convenient that the time that you needed this visa, your brother was able to email your, not email you, excuse me, email wasn't then, but to phone you at that particular time and say, mail me your passport so we can get you the new U.S. visa. Let me ask you another question about supposing that we find the petitioner credible. At that point, it seems to me that the BIA did not adopt the IJ's decision on this particular matter, and they made their own decision. And I didn't find that the second IJ adopted the former IJ's findings on that either. So at that point, would I need to remand this? Yes, Your Honor, we would concede that remand would be appropriate at that time. If you feel that the record of its compels the conclusion that she provided credible testimony, the fact of the matter is that the board's decision is limited to the adverse credibility termination as well as the well-founded determination based upon changed country conditions. If you determine that it needs to be with regards to whether or not she's actually suffered past persecution because that determination wasn't made by the board, then you'd have to remand it back to determine what happened to her. The three visits, did that constitute persecution? And then was that persecution on account of a protected ground? And that analysis is not in the board's decision. Do you agree with counsel, and I ask him about this because the procedural posture really of this issue is unclear in the record, but I tried to come up with what I thought it was in order to be sure. So it seemed to me that the only reason there was a remand to review country conditions and that at the same time there was a 2001 remand motion, that this is really a motion to reopen. Would you agree? I would agree, and I would add the following. And, again, this is also just my speculation because I wasn't involved in this. The appeal to the board was in 1997, and that appeal sat for a long time with the board. Within that interim, her counsel filed the motion to remand or motion to reopen, just the same thing. The board issued a decision dismissing the appeal, and within that decision there's one sentence talking about the motion to remand. Right. When the petition for review was filed within the Second Circuit, there was a joint stipulation filed by both parties, the government as well, to remand it on the country conditions. Given our practice, and I think this is just my speculation, because the board treated the motion to remand with only one sentence, I don't know what the governing case law in the Second Circuit at that time was, but I'm given that wasn't sufficient. So that's why it was remanded back to the board specifically to discuss the current country conditions on the well-founded fear, because her membership is not at issue. That wasn't part of the credibility termination. So if her membership would cause her harm if she's returned, that to me is the posture why it was sent back. And given that it was a matter of verbatim that applied to that particular issue, then that's the only place really where that would be applicable. Exactly. That's the only place, and the credibility termination is separate and apart from that. That's the way I understood it. I appreciate that. So as you address the evaluation of country conditions. Excuse me? Can you address the country conditions issue? Sure. Do you have anything specific you'd like to address? I mean, the immigration judge points specifically to the fact that the country conditions in the evidence had changed, and the Petitioner failed to provide any individualized evidence to contradict the country reports. She failed to provide any evidence that because of her membership, you know, when she returned, so what she was left with was the State Department report that they had. And in the State Department report, there was indication that it was – there was no – there was no finding that, based upon the country reports, that she had a well-founded fear of future persecution if returned. And frankly, as I understand it, it all had to do that she had the same ethnicity as 25% of the population, member of the same political party as 10% of the House of Representatives. That's correct. And that – I mean, the IG acknowledged Ethiopia had political problems, but the current conditions appeared better, as I understood. Right, and there had been free elections, and although problems existed, the conditions were getting better. And she provided no evidence to contradict the findings that were provided, so. Anything else, Counselor? No, so in conclusion, just as long as one of the identified grounds supports the negative credibility determination, we ask that this Court deny the petition for review. Thank the government for being here today under tough conditions. Counselor, you're down to four seconds, but I'll give you 30 seconds. Get up and give us your final hurrah, if you will. Final thought is, as the government acknowledges, that her membership in the political party is not in doubt. And so at the very least, we would submit that the country conditions analysis, which was limited really to her ethnic group rather than her political party and should be remanded for consideration really of her political party. Just for procedural posture, I'll just note the remand contained on page 565 from the Second Circuit wasn't limited just to country conditions. It said for consideration of country conditions and reconsideration of the original decision. So, therefore, it was a remand to consider the case in its entirety. Unless the Court has any further questions, I'll rest on my brief. Thank you very much. Thank you both for your argument today. Case 08-73733, Werenke v. Holder is submitted.
judges: Quist, Smith, Nguyen